## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Dana Alan W., | Case No. 20-cv-691 (HB) |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew Saul, Commissioner of Social Security, | |
| Defendant. | |

Karl E. Osterhout, Osterhout Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA, 15139, for Plaintiff

Christopher Carillo, Special Assistant U.S. Attorney, 1301 Young Street, Suite 350, Dallas, TX, 75202, for Defendant

HILDY BOWBEER, United States Magistrate Judge[1]

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dana W. seeks judicial review of a final decision by the Commissioner of Social Security denying his application for supplemental security income (SSI). The matter is now before the Court on the parties' cross-motions for summary judgment [ECF Nos. 24, 27]. For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment and grants the Commissioner's motion for summary judgment.

---

[1] The parties have consented to have a United States Magistrate Judge conduct all proceedings in this case, including the entry of final judgment.

## I.  Background

### A.  Factual Background

Plaintiff's medical history is somewhat difficult to follow because Plaintiff saw numerous providers and was incarcerated several times during the relevant period.  It is clear, however, that by 2014 Plaintiff suffered from uncontrolled diabetes due to his refusal to accept insulin therapy.  (*E.g.*, Soc. Sec. Admin. R. (hereafter "R.") 265–66.)

On May 18, 2016, Plaintiff presented at a clinic to establish care with Dr. Michael Liebe, M.D., and reported that he had recently been released from prison.  (R. 278–79.) Although Plaintiff told staff at the clinic that he believed his blood sugar levels were "under very good control" (R. 279), A1C lab results revealed that Plaintiff's blood glucose level was "extremely high," at 14.7%.  (R. 287.)  *See also* American Diabetes Association, *Understanding AIC*, https://www.diabetes.org/a1c (last visited March 12, 2021).  During the visit Dr. Liebe completed an opinion form to assist Plaintiff in obtaining county benefits.  On that form Dr. Liebe indicated that Plaintiff could "perform any employment now."  (R. 538.)  In a communication to Plaintiff the next day, Dr. Liebe stated he believed Plaintiff needed insulin treatment and informed Plaintiff that failure to manage his diabetes could be life-threatening.  (R. 287.)  He also referred to an appointment that had been scheduled for that morning that Plaintiff had apparently missed.  (R. 287 ("I thought we had agreed you were going to come to clinic today at 10:00 to start the process.").)

In July 2016 Plaintiff established himself as a patient with a different physician. (R. 290.)  At that initial visit Plaintiff complained of numbness in both feet and "burning

2

pain mainly in the morning," but again refused to accept insulin treatment and declined further education on managing his illness.  (R. 290.)

On later occasions Plaintiff was treated by various providers for a foot injury and swelling in both feet.  (R. 298, 308, 315.)  Although Plaintiff's diabetes continued to be "in terrible control" (R. 300), Plaintiff continued to express skepticism about the medical providers' recommended courses of treatment and was "very focused" on having the providers complete opinion forms to allow Plaintiff to receive disability or medical services.  (*See* R. 308, 310, 315.)  In one instance Plaintiff "asked [the provider] a couple times" about which of his symptoms would, in the provider's opinion, qualify him for disability.  (R. 308.)  On a later date Plaintiff brought in a form to have his doctor sign and informed his doctor that he, Plaintiff, felt "as though he is currently disabled and not able to work at least for the next 90 days."  (R. 315.)  The records indicate Plaintiff finally began taking insulin in August 2016.  (R. 308.)

On December 7, 2016, Plaintiff established himself as a patient with Dr. Brian Thompson, M.D.  (R. 380.)  During that visit Plaintiff indicated he had "painful," "debilitating" neuropathy in his feet and Dr. Thompson completed Plaintiff's form for county benefits indicating "diabetic neuropathy" as Plaintiff's disability.  (R. 383, 510.)  Dr. Thompson also checked a box indicating that, in his opinion, Plaintiff would not be able perform any employment for the foreseeable future.  (R. 510.)

In February 2017, Plaintiff saw Dr. Thompson again for "ongoing neuropathy pain in both feet and hands" and pain in his knee, back, and neck.  (R. 396.)  During that visit

Plaintiff indicated he "needs a cane, and cannot work due to this."  Dr. Thompson

prescribed a cane.  (R. 361, 396.)

At some point Plaintiff violated the terms of his supervised release and was

returned to prison for some period of time.  In March 2018 Plaintiff saw Dr. Thompson

again for several complaints, including that he had "scratched two holes on his feet while

in jail."  (R. 409.)  On that visit, Dr. Thompson completed another opinion form in which

he diagnosed Plaintiff with peripheral neuropathy and indicated Plaintiff would have

permanent "limited ambulation."  (R. 508.)  Dr. Thompson checked the box on the form

indicating that Plaintiff could not work for the foreseeable future.  (R. 508.)

Sometime later Plaintiff was incarcerated again, this time in the custody of the

Itasca County Sheriff's Office.  (R. 587.)  During a visit with a nurse at the facility in

September 2018, Plaintiff refused to have his blood sugar level tested and "stated he

[was] no longer taking insulin" or other medications.  (R. 587, 590.)  During a visit in

January 2019 Plaintiff indicated he was not insulin dependent and was not taking any

medications.  (R. 600–01.)

### B.    Procedural Background

Plaintiff filed an application for SSI on November 30, 2016, alleging an onset of

disability date of that same day.  (R. 15 [ECF No. 20].)  Plaintiff's application was denied

initially and on reconsideration, and he timely requested a hearing before an

administrative law judge (ALJ).  (R. 15.)  The ALJ convened a hearing at which Plaintiff

and a vocational expert testified.  (R. 15.)

On July 30, 2019, the ALJ issued a written decision denying Plaintiff's application.  (R. 15–28.)  Following the five-step sequential analysis outlined in 20 C.F.R. § 416.920(a)(4), the ALJ first determined Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 17.)  At step two, the ALJ determined Plaintiff had one severe impairment: diabetes mellitus with peripheral neuropathy.  (R. 17.)  The ALJ found at the third step that the impairments did not meet or equal the severity of an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 20.)  At step four, the ALJ assessed Plaintiff's residual functional capacity (RFC).  (R. 21–26.)  As part of that assessment, the ALJ determined that Plaintiff's impairment could reasonably be expected to cause the alleged symptoms, but found that Plaintiff's statements about the intensity, persistence, and limiting effects of the impairments were "not entirely consistent with the medical evidence and other evidence in the record."  (R. 22.)  The ALJ reviewed Plaintiff's treatment history and analyzed and assigned evidentiary weight to the opinions of medical professionals who opined on Plaintiff's condition.  (R. 21–26.)  The ALJ ultimately found Plaintiff retained the RFC to perform medium work, as defined in 20 C.F.R. § 416.967(c), with the following additional restrictions: occasional use of foot controls; occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing; frequent stooping, kneeling, crouching and crawling; avoid concentrated exposure to extreme cold, wetness, vibration, and workplace hazards such as heights and machinery.  (R. 21.)

The ALJ went on to note that Plaintiff had no recent relevant work history pursuant to 20 CFR § 416.965 because he had spent several years in prison.  (R. 26.)

However, the ALJ concluded, based on Plaintiff's age, education, work experience, and RFC, that there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (R. 27.)  Accordingly, the ALJ determined Plaintiff was not disabled.  (R. 27–28.)

The Social Security Administration (SSA) Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1.)  Plaintiff then filed this action for judicial review of his denial of SSI.

Plaintiff argues the ALJ erred at the fourth step by concluding that Plaintiff had the RFC to perform medium work.  (Pl.'s Mem. Supp. Mot. Summ. J. at 1 [ECF No. 25].)  Specifically, Plaintiff contends the ALJ erroneously assigned little weight to the medical opinion of Dr. Brian Thompson, MD, Plaintiff's treating physician.  (*Id.*)  Plaintiff also argues the ALJ erred by discrediting Plaintiff's subjective account of his limitations when he determined Plaintiff's residual functional capacity.  (*Id.*)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited in the parties' memoranda.  The Court will incorporate the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    Standard of Review

Judicial review of the SSA's denial of benefits is limited to determining whether substantial evidence on the record supports the decision.  42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind

would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would support a different outcome, or the Court would have decided the case differently. *Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden to prove his disability. *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). To meet the definition of disability for SSI, the claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The disability, not just the impairment, must have lasted or be expected to last for at least twelve months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

### III. Discussion

#### A. Legal Standards Applicable to Step Four RFC Determination

An RFC assessment measures the most a person can do, despite his limitations, in a work setting. 20 C.F.R. § 404.1545(a)(1). The ALJ is responsible for assessing a

claimant's RFC.  20 C.F.R. § 404.1546(c).  The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  In addition, "RFC is not simply a laundry list of impairments and limitations." *Gann v. Colvin*, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015).  Thus, the ALJ may distill what may be numerous impairments and limitations into a descriptive phrase, as long as it accurately captures a claimant's abilities in a work setting.  *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001) (finding the ALJ's description of the claimant as "able to do simple, routine, repetitive work" adequately accounted for the claimant's borderline intellectual functioning).

**B.     The ALJ's Consideration of Dr. Thompson's Medical Opinions**

Plaintiff's first challenge is that the ALJ erred when he accorded only "slight weight" to the opinions of Dr. Brian Thompson, M.D.  (Pl.'s Mem. Supp. Mot. Summ. J. at 12.)  The opinion of a treating medical source should be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002).  But a treating physician's opinion does not "automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 786 (8th Cir. 1995).  An ALJ may discount a medical opinion if it is inconsistent with other substantial evidence, such as "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions

that undermine the credibility of such opinions." *Prosch*, 201 F.3d at 1013 (citations

omitted); *see also Goff v. Barnhart*, 421 F.3d 785, 790–91 (8th Cir. 2005).

Twice Dr. Thompson completed a form to assist Plaintiff in obtaining county

services in which he offered his opinion as to Plaintiff's physical limitations.  The first

opinion is from December 7, 2016.  (R. 330.)  Dr. Thompson diagnosed Plaintiff with

diabetes (IDDM) and diabetic neuropathy and opined Plaintiff would have permanent

limited ambulation and weight bearing.  (R. 330.)  Dr. Thompson completed the same

form again on March 12, 2018.  (R. 508.)  He again diagnosed Plaintiff with "peripheral

neuropathy" and stated Plaintiff was "ambulation limited."  (R. 508.)  On both occasions

Dr. Thompson checked a box indicating he believed Plaintiff would not be able to

perform any employment in the foreseeable future.  (R. 330, 508.)

The ALJ cited both opinions in his decision and accorded them "slight weight"

because they were "provided in a form for county benefits without any support from the

objective evidence of record and treatment notes."  (R. 24.)  The ALJ correctly observed

that both opinions are conveyed via a checklist and fill-in-the-blank form and are entirely

lacking in explanation.  On neither form did Dr. Thompson explain the limitations he

cited, such as by qualifying them in terms of duration or distance or by referring to

specific findings in Plaintiff's medical records.  The Eighth Circuit Court of Appeals has

taken a dim view of such forms.  *See, e.g.*, *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th

Cir. 2018).  The forms completed by Dr. Thompson were similar to the form at issue in

*Thomas*, which "consist[ed] of nothing more than vague, conclusory statements—

checked boxes, circled answers, and brief fill-in-the-blank responses."  *Id.*  As in *Thomas*,

9

Dr. Thompson's assessment recounted no medical evidence and provided no elaboration and thus possessed "little evidentiary value." *Id.* (quoting *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)).

There are other problems with Plaintiff's reliance on Dr. Thompson's form opinions. To begin, it is unclear what specific limitations Plaintiff contends the ALJ should have derived from Dr. Thompson's form opinions. Plaintiff seems to suggest the RFC should be modified to allow Plaintiff to elevate "his lower extremities on an unpredictable basis." (Pl.'s Mem. Supp. Mot. Summ. J. at 1.) But the connection between elevating his feet and Dr. Thompson's conclusion that Plaintiff had "limited ambulation, weight bearing" is not clear, and the forms themselves say nothing about elevating Plaintiff's extremities, unpredictably or otherwise.

Furthermore, Dr. Thompson's observations about Plaintiff's ability to stand and walk are also largely unsupported by Plaintiff's medical records.[2] Although several providers discuss Plaintiff's recurring painful neuropathy and swelling in his feet, the records are essentially devoid of any discussion of Plaintiff's gait and station. (*See, e.g.*, R. 290, 292, 298, 307, 315, 323.) In fact, on March 27, 2018—two weeks after Dr. Thompson issued his second form opinion stating Plaintiff had limited ambulation—a

---

[2] The Court notes that Dr. Thompson's first form opinion was issued on December 7, 2016—the day of Plaintiff's first visit to Dr. Thompson. Then, in February 2017, Dr. Thompson wrote that he believed Plaintiff should undergo a functional capacity evaluation to get "more information" on Plaintiff's abilities, but that without that evaluation, he would "not have much to add in regards to [Plaintiff's] workability at this time." (R. 357.) It is therefore clear that Dr. Thompson, himself, felt limited in his ability to comment on Plaintiff's functional capacity, which supports the ALJ's perception that Dr. Thompson's opinion was "temporary" in nature. (R. 24.)

different provider commented that Plaintiff's gait was normal. (R. 424.) At a reevaluation appointment on April 16, 2018, the provider again observed that Plaintiff's gait was "normal" and that he had "normal muscle tone." (R. 432.)

Finally, the ALJ's RFC *does* contain several limitations related to Plaintiff's legs and feet, including limiting Plaintiff to only occasional use of foot controls; occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; and occasional balancing. (R. 21.) Plaintiff has not shown that Dr. Thompson's conclusory observations about Plaintiff's ability to ambulate and bear weight are inadequately captured by this RFC. The Court concludes the ALJ's determination to give slight weight to the form opinions of Dr. Thompson was not contrary to substantial evidence.

### C.     The ALJ's Consideration of Plaintiff's Assistive Device

Plaintiff also argues the ALJ's RFC was inadequate because it does not account for evidence in the record that Plaintiff needed a cane to walk. (Pl.'s Mem. Supp. Mot. Summ. J. at 1.) Although Dr. Thompson did not opine on Plaintiff's need for an assistive device in either the December 2016 or March 2018 form opinions, he prescribed Plaintiff a cane on February 28, 2017. Dr. Thompson's notes from that visit report that Plaintiff described "[o]ngoing neuropathy pain in both feet and hands" and "a lot of knee, back, and neck pain." (R. 361.) Dr. Thompson wrote that Plaintiff wanted to try a higher dosage of his pain medication and "needs a cane, and cannot work due to this." (R. 361.)

There is little record evidence of Plaintiff's use of the cane after it was prescribed in February 2018. A year later, in February 2019, a healthcare provider from the Minnesota Department of Corrections conducted a health screening and observed that

11

Plaintiff did not use any assistive device, including a cane.  (R. 490, *see also* R. 495.)

Then, during his hearing with the ALJ in May 2019, Plaintiff was asked about his cane

usage and answered: "I don't know where the cane is, but I moved.  When I moved in

with my two brothers, my cane just disappeared somehow.  But I still hold onto the walls,

you know, and the doors when I walk, you know, into different rooms."  (R. 40.)

　　　In formulating his RFC, the ALJ did not include Plaintiff's use of a cane,

concluding that it was not supported by the overall record.  (R. 25.)  He went on,

> While it is true that the claimant did use a cane at one point during the claim
> period, per his testimony he lost his cane in the process of moving and has
> not replaced it.  (See Hearing Record)  [It] would seem unlikely to lose an
> assistive device if one was consistently using one, and also unlikely that he
> would have failed to replace it in a timely manner considering the degree of
> limitations and symptoms alleged.

(R. 25.)  Plaintiff argues this conclusion was in error.  Specifically, Plaintiff points to Dr.

Thompson's notes stating that Plaintiff "needs a cane, and cannot work due to this" (R.

361) as clear evidence that Plaintiff's condition was disabling without the device.

　　　The Court disagrees.  First, Dr. Thompson states later in the same treatment note

that Plaintiff "would *like* a cane" (R. 362 (emphasis added)), which is not the same as a

conclusion on Dr. Thompson's part that Plaintiff *required* a cane.  More importantly, in

order for the Court to "find that a hand-held assistive device is medically required, there

must be medical documentation establishing the need for a hand-held assistive device to

aid in walking or standing, and describing the circumstances for which it is needed."

Social Security Ruling ("SSR")  96-9p, 1996 WL 374185, at *7 (S.S.A. July 2, 1996).  A

prescription for an assistive device is not necessarily dispositive of the presence or

absence of medical necessity.  *See, e.g.*, *Staples v. Astrue*, 329 F. App'x 189, 191–92 (10th Cir. 2009).  Here, the record contains no evidence of the necessity of the assistive device, documentation of the cane's usage, or description of the circumstances under which Plaintiff would need the cane to walk or stand.  Instead, it appears that Plaintiff was no longer using the cane within a year of its prescription.  Accordingly, the ALJ's decision to not include use of a cane in Plaintiff's RFC was not contrary to substantial evidence.

**D.     The ALJ Correctly Evaluated Plaintiff's Subjective Symptoms**

Plaintiff's final argument is that the ALJ erred in failing to properly consider Plaintiff's subjective account of his disability.  (Pl.'s Mem. Supp. Mot. Summ. J. at 17–18.)  Specifically, Plaintiff argues the ALJ failed to fully consider Plaintiff's statements about his activities of daily living and the efficacy of his medication (*id.* at 17–18), such that the ALJ's analysis of Plaintiff's "self-described limitations is not based upon a logical or reasonable reading of the evidence" (*id.* at 1).

An ALJ must consider several factors in evaluating a claimant's subjective symptoms and their effect on his RFC, in addition to whether the symptoms are consistent with the objective medical evidence.  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* SSR 16-3p, 2016 WL 1119029, at *2 (S.S.A. Mar. 16, 2016).  These factors include the claimant's daily activities; work history; intensity, duration, and frequency of symptoms; side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions.  *Polaski*, 739 F.2d at 1322; SSR 16-3p, 2016 WL 1119029, at *5.  But the ALJ does not need to explicitly discuss each

13

factor (*Goff*, 421 F.3d at 795), and a court should defer to the ALJ's findings when the ALJ expressly discredits the claimant and provides good reasons for doing so.  *Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

Here, the ALJ considered "all symptoms and the extent to which these symptoms . . . [were] consistent with the objective medical evidence."  (R. 21.)  Indeed, the ALJ began his step four analysis with an account of Plaintiff's description of his pain:

> The symptoms of the claimant's impairments allegedly interferes with several work-related abilities such as lifting, squatting, bending, standing, reaching and using hands, walking, kneeling, seeing, and climbing stairs. . . . Per his testimony, he has ongoing numbness and swelling in his feet and toes for which he wears compression stockings, takes prescribed medications, and elevates his legs daily. . . .  He also reported taking medications for diabetes mellitus with a high Hemoglobin A1C value greater than 13.  He reported chronic pain, inability to walk more than half a block, and balance issue necessitating the use of a prescribed cane.

(R. 22.)  The ALJ went on to offer a thorough recounting of Plaintiff's medical history, including Plaintiff's efforts to find a medication that helped manage his neuropathy.  (*See* R. 22–25.)  He noted that Plaintiff's treatment had been "stymied by inconsistent compliance with prescribed medications and recommended treatment," and specifically that medical records from 2018 and 2019 depict ongoing noncompliance with prescribed medications.  (R. 26.)  In particular, the ALJ highlighted one instance in April 2019 when Plaintiff expressed that he was "not interested" in taking his prescribed medications because he believed his recent weight loss had cured his diabetes (R. 26, 561)—although at the hearing Plaintiff indicated he had since restarted treatment (R. 39–40).  The ALJ also discussed Plaintiff's activities of daily living and how they affected his conclusion:

> Further, at one time or another during the claim period, the claimant reported involvement in a number of activity [sic] generally consistent with the ability to perform work within the residual functional capacity above.  These include searching for jobs, biking as a means of transportation, attending to his own care, taking care of a pet, shopping in stores, managing his own finances, mowing the lawn, fishing, playing cards, and interacting with others. . . .  The undersigned finds that these activities are generally consistent with the ability to perform work within the residual functional capacity defined above.

(R. 26.)  The ALJ ultimately concluded that Plaintiff's allegations of disability are not "completely consistent with the evidence of record" since "the weight of the objective medical evidence, physical examinations and observations, course of treatment, medications, and overall functioning do not corroborate the level of restrictions the claimant alleges due to various impairments."  (R. 26.)

The Court agrees with this conclusion.  *See Goff*, 421 F.3d at 792 (finding that evidence that the plaintiff was able to vacuum, wash dishes, do laundry, cook, shop, drive, and walk amounted to inconsistencies between the plaintiff's subjective complaints and her activities, which diminished her credibility).  It therefore rejects Plaintiff's contention that the ALJ "[failed] to draw a logical bridge between the evidence and his findings."  (Pl.'s Mem. Supp. Mot. Summ. J. at 17.)  It is of no moment that the ALJ did not specifically mention various details that Plaintiff argues are salient, such as Plaintiff's account that when he shops, he requires the use of the cart to support himself, or that while incarcerated Plaintiff was issued a second pillow in order to elevate he legs.  (*Id.* at 17–18.)  The ALJ cannot reasonably be expected to recount every relevant detail that went into his analysis, and he is not required to.  *See Massanari*, 255 F.3d at 582.

15

The Court finds the ALJ considered the entire record, including Plaintiff's testimony about his pain and other subjective assessments, when making his RFC determination. Accordingly, the ALJ's decision that Plaintiff had the RFC to perform medium work with additional limitations was based on proper considerations and was grounded in substantial evidence.

### E. Conclusion

The ALJ did not err in determining at the fourth step that Plaintiff could perform medium work. The ALJ properly considered the medical evidence and medical opinions of record and accounted for Plaintiff's subjective factors in determining Plaintiff's RFC.

Accordingly, based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Dana W.'s Motion for Summary Judgment [ECF No. 24] is **DENIED**; and

2. Defendant Andrew Saul's Motion for Summary Judgment [ECF No. 27] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: April 12, 2021                    *s/ Hildy Bowbeer*
                                         HILDY BOWBEER
                                         United States Magistrate Judge